SIXTH DIVISION
March 4, 2011

No. 1-09-0517

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | 06 CR 25180 |
| | ) | |
| ALEXANDER TAYLOR, | ) | Honorable |
| | ) | Marcus R. Salone, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE ROBERT E. GORDON delivered the judgment of the court, with opinion.
JUSTICES CAHILL and McBRIDE concurred in the judgment and opinion.

**OPINION**

Following a jury trial, defendant Alexander Taylor, an African-American, was convicted of aggravated battery of a senior citizen; aggravated battery to an employee of a hospital engaged in the performance of her duties and aggravated battery that knowingly caused her great bodily harm. After a hearing to reconsider defendant's initial sentence of three concurrent terms of 5 years' imprisonment, the trial court sentenced defendant to three concurrent terms of 3 years' imprisonment in the Illinois Department of Corrections, with a credit of 850 days for time considered served. On appeal, defendant seeks reversal of his convictions, claiming that the trial court: (1) failed to conduct a proper fitness hearing and, as a result, abused its discretion in finding defendant fit to stand trial; (2) erred and violated *Batson v. Kentucky*, 476 U.S. 79 (1986), when the State exercised two of its peremptory challenges to purposefully exclude two African-American venirepeople from the jury; (3) failed to comply with the mandate of Supreme Court

Rule 431(b) (Ill. S. Ct. R. 431(b) (eff. May 1, 2007)); and (4) improperly allowed the State to present the testimony of one of the victim's medical physicians because: (a) the State failed to disclose "a statement of the doctor's qualifications" as an expert in violation of Supreme Court Rule 412 (Ill. S. Ct. R. 412 (eff. Mar. 1, 2001)); (b) the medical physician's testimony concerning "the victim's psychological injuries was irrelevant"; (c) the medical physician's testimony "contained inadmissible hearsay concerning medications prescribed by a psychiatrist and neurologist"; and (d) the State failed to lay a proper foundation for the medical physician's testimony "concerning the medications prescribed to [the] victim." We affirm.

## I. BACKGROUND

On November 11, 2006, defendant was charged by indictment with three counts of aggravated battery: one count of aggravated battery of Leonard Giles, a 60-year old hospital security supervisor, pursuant to section 12-4.6(a) of the Criminal Code of 1961 (Code) (720 ILCS 5/12-4.6(a) (West 2006)) (aggravated battery of a senior citizen); and two counts of aggravated battery of Vida Catalla, a hospital staff nurse, pursuant to section 12-4(b)(7) (720 ILCS 5/12-4(b)(7) (West 2006)) (aggravated battery to hospital personnel engaged in the performance of her duties) and section 12-4(a) (720 ILCS 5/12-4(a) (West 2006)) (aggravated battery that knowingly caused great bodily harm). The charges arose from a physical altercation that occurred while defendant was a patient in a psychiatric unit of the Lincoln Park Hospital where Giles and Catalla were employed.

On December 5, 2006, the Cook County public defender's office was appointed to represent defendant. An assistant public defender requested a behavioral clinical examination

(BCX) for defendant to determine his fitness to stand trial because defendant was a psychiatric patient at the time of the offenses.

On March 12, 2007, a fitness hearing was held and Dr. Susan Messina, a clinical psychologist employed by the Forensic Clinical Services (FCS), was the only witness to testify concerning defendant's fitness. Dr. Messina testified that she was a licensed psychiatrist, and the parties stipulated to her qualifications as an expert. Dr. Messina testified that she interviewed defendant on December 11, 2006, and February 8, 2007. She testified that she also reviewed defendant's medical and arrest records. She further testified that she conducted a mental status examination of defendant and opined that defendant demonstrated an understanding of the charges against him, the legal proceedings, and the roles of court personnel.

Dr. Messina also testified that defendant would often become "tangential" in his responses and "focus *** on his own victimization." She testified that defendant had a "distorted perception based on his paranoia and suspiciousness and distrust." Based on those observations, she opined, within a reasonable degree of medical and psychiatric certainty, that defendant was not fit to stand trial because he would be unable to assist counsel in his defense. She further opined that "with appropriate clinical attention and medication" defendant could be restored to fitness for trial within one year. Based on Dr. Messina's testimony, the trial court entered an order finding defendant unfit to stand trial and ordered defendant to be "confined in the least constrictive secure in-patient setting by the Department of Human Services."

At a status hearing on September 24, 2007, the State informed the trial court that it had received a psychiatrist's written report concerning defendant's fitness to stand trial from the

Chester Mental Health Center where defendant was confined. The State did not mention who wrote the report and it was not included in the record. According to the State, the report stated that defendant was able to understand the nature of the charges against him and would be able to cooperate in his defense. The State also informed the trial court that a psychiatrist from FCS was prepared to examine defendant on September 25, 2007, and provide an opinion concerning his fitness to stand trial. The trial court instructed defense counsel that a fitness restoration hearing was necessary if defendant was found fit to stand trial and set a date for a fitness restoration hearing to be held on November 7, 2007.

On September 26, 2007, Dr. Nishad Nadkarni, an FCS staff psychiatrist, submitted to the trial court a written evaluation concerning his opinion on defendant's fitness to stand trial. In his written evaluation, Dr. Nadkarni stated that he evaluated defendant on September 25, 2007, and opined that defendant manifested "severe antisocial and borderline character pathology." He opined that defendant demonstrated to him "an adequate understanding of the charges against him, and adequate comprehension of the nature of courtroom proceedings and the roles of various courtroom personnel." He further opined that defendant demonstrated a capacity to assist counsel in his defense, found no evidence that he suffered from adverse effects from his medication regimen that would impair his fitness, and opined that "any observations of noncooperativity *** should be interpreted as volitional on his part." Dr. Nadkarni opined, within a reasonable degree of medical and psychiatric certainty, that defendant "is currently restored to fitness to stand trial, with medication." He stated that defendant's medication regimen consisted of Seroquel, an antipsychotic, and Depakote, a mood stabilizer.

4

On November 7, 2007, defense counsel informed the trial court that Dr. Nadkarni was unavailable to testify at the fitness restoration hearing, and the trial court continued the matter to December 3, 2007. On that date, Dr. Nadkarni did not testify and the record is not clear whether he even appeared or provided reasons for his failure to testify. Defense counsel then requested that a psychiatrist other than Dr. Nadkarni reevaluate defendant concerning his fitness to stand trial. The trial court ordered defendant to be reevaluated by an FCS psychiatrist other than Dr. Nadkarni and continued the matter to January 7, 2008.

On January 7, 2008, Dr. Andrew Kulik, an FCS forensic psychologist, submitted to the trial court a written evaluation concerning his opinion on defendant's fitness to stand trial. In his written evaluation, Dr. Kulik stated that he evaluated defendant on December 14, 2007, and opined that defendant demonstrated that he "is cognizant of his charge[s], understands the nature and purpose of legal proceedings, and shows the ability to cooperate with counsel in his defense if he so chooses." He also opined that defendant was responding well to his medication regimen of Seroquel and Depakote, and not experiencing any side effects that would impair his fitness to stand trial.

Dr. Kulik also opined in his written evaluation that, after reviewing "the available records and information" he obtained during his interview, he found "no report or documentation" that indicated defendant experienced any symptoms of mental disease or defect which would have caused him "to lack the substantial capacity to appreciate the criminality of his conduct at the time of the alleged offense." Dr. Kulik opined, within a reasonable degree of medical and psychiatric certainty, that defendant "is fit to stand trial with medication, *** was legally sane at the time of

5

the alleged offense, \*\*\* and had the ability to understand *Miranda* [warnings] at the time of his arrest."

Defense counsel informed the trial court that the public defender's office was hiring a private psychiatrist to evaluate defendant's fitness to stand trial and requested a continuance to obtain the private psychiatrist's evaluation and have that medical provider review Dr. Kulik's written evaluation. The trial court granted defense counsel's request for a continuance.

The matter was continued to May 6, 2008, when defense counsel informed the trial court that defendant had been evaluated by a private psychiatrist who agreed with the opinion of Dr. Kulik that defendant is fit to stand trial with medication. The private psychiatrist's name is not in the record and there is also no written evaluation in the record from the private psychiatrist concerning defendant's fitness to stand trial. Defense counsel then stated to the trial court that she would be able to stipulate to defendant's fitness to stand trial. The State then summarized the parties' stipulation as follows:

"THE STATE: Fitness with medication. The stipulation would be that [defendant] was originally seen by Dr. Kulik \*\*\* pursuant to court order on December [3], 2007, in order to render an opinion regarding fitness to stand trial, fitness with meds, sanity and ability to understand *Miranda* [warnings].

The defendant was found by the doctor within a reasonable degree of medical and psychiatric certainty that he was fit to stand trial with medication. Dr. Kulik found he is cognizant of his charge[s], understand[s] the nature and the legal proceedings, showed the ability to cooperate with counsel if he so chose.

6

Although he has been diagnosed with mental illness, he, at that time, appeared to be fairing well with his current medication. At that time his medication was Seroquel, an antipsychotic, and [Depakote], a mood stabilizer.

The doctor also opined the defendant was not experiencing any side effects at that time from that medication. I believe [defense counsel] asked Dr. Kulik [sic] at the request of the Public Defender's Office to evaluate the defendant as well, and he was in concurrence most recently with that same diagnosis.

DEFENSE COUNSEL: Correct."

Following the parties' stipulation to defendant's fitness, the trial court did not make any oral or written findings whether defendant was fit to stand trial. The parties then discussed the possibility of a plea offer of time served because, at that point in time, defendant had served 561 days. The defendant was offered three years' imprisonment and the trial court continued the matter to June 2, 2008.

On June 2, 2008, defendant declined the plea offer and the trial court set a trial date for July 14, 2008. On that date, the trial court continued the trial date to September 9, 2008.

On August 6, 2008, defense counsel filed a motion with the trial court requesting a hearing to determine whether defendant could knowingly and voluntarily waive an insanity defense. In the motion, defense counsel stated that she believed that asserting an insanity defense and self-defense would be in defendant's best interest. However, after discussing the two defenses with defendant, she claimed that defendant was adamant that he wanted to assert only a self-defense claim.

The trial court held a hearing on defense counsel's motion on August 13, 2008. The trial court explained to the defendant that if he asserted only a self-defense claim and was found guilty of the charges that he could be sent to a penitentiary, whereas if he asserted an insanity defense and he was able to show he was insane at the time of the offense, or if he was found not guilty he would not be sent to a penitentiary, but to another mental health facility. The following colloquy took place between the trial court and defendant:

"THE COURT: Mr. Taylor, do you understand what I'm saying?

DEFENDANT: I understand what you're saying.

THE COURT: Can you explain what you understand?

DEFENDANT: I understand that if – if – if –

THE COURT: If you are found insane at the time of the offense –

DEFENDANT: If I'm found to be insane.

THE COURT: You may be sent to – where are we talking?

DEFENDANT: I know they sent me to – they said they send me to Elgin [Mental Health Center], but they sent me to Chester [Mental Health Center]. They almost killed me out there. The guards strangled me. They tore up all my property. ***

THE COURT: I know, you told me about this before.

DEFENDANT: It was crazy. I don't want to have to go through that again. Plus, I'm innocent of this crime –

THE COURT: Tell me what I just tried to explain to you about the

8

difference between an insanity defense –

DEFENDANT: I know. You said that if I'm found guilty by reason of insanity I go out to one of those places like a hospital. They said I [was] supposed to go to Elgin last time. I didn't. I went to Chester and they almost killed me out there, you know what I'm saying.

THE COURT: I also said that if you're found guilty as charged, you might go where?

DEFENDANT: The penitentiary, but I'm not guilty, so I'm going to fight."

The trial court found that defendant's waiver of his insanity defense was given knowingly and voluntarily and entered a written order with that finding. The trial court set a new trial date of October 16, 2008.

On October 16, 2008, jury selection began. Following the swearing in of the venire, the trial court informed and questioned the venire of 22 people concerning certain principles of law, namely: (1) that a defendant is presumed innocent; (2) that he must be proven guilty beyond a reasonable doubt; and (3) that he is not required to offer any evidence in his own behalf. However, the trial court did not inform the potential jurors of a fourth principle of law, namely (4) that a defendant's failure to testify in his own behalf cannot be held against him. These four principles are now commonly known as the "*Zehr* principles." See *People v. Thompson*, 238 Ill. 2d 598 (2010); *People v. Hammonds*, 399 Ill. App. 3d 927, 946 (2010).

With respect to the first three principles of law, the trial court stated, in pertinent part:

"[1.] Under the law the defendant is presumed to be innocent of the

9

charges against him. Is there anyone among you who has any problem with that legal provision that the defendant is presumed to be innocent of the charges against him? If so, please state your objection now. There is no response.

This presumption remains with the defendant throughout every stage of the trial and during your deliberation on the verdict and it is not overcome unless from all this evidence in this case you are convinced beyond a reasonable doubt, that the defendant is guilty.

[2.] The State has the burden of proving the guilt of the defendant beyond a reasonable doubt. And this burden remains on the State throughout the case. Are there any among you who have any problems with that requirement of the law? That the State has the burden of proving the guilt of the defendant beyond a reasonable doubt, and this burden remains on the State throughout the case? If so, please voice your exception at this time. There is no response.

[3.] The defendant is not required to prove his innocence, nor is he required to present any evidence on his own behalf. He may rely upon the presumption of innocence. Again, is there anyone among you who has any exception to that provision of the law? If so, make your exception know at this time. There is no response."

Defense counsel did not object to the trial court's instructions or its questioning of the venire. Following the trial court's questioning of the venire, the State requested that the trial court excuse venireperson A.T., an African-American, for cause because of his arrest record. The

trial court declined to excuse him for cause and the State exercised a peremptory challenge to excuse him.

The State exercised a second peremptory challenge against venireperson V.W., an African-American, who testified that she was employed as a caseworker, attended church regularly, was unmarried, had no children, and had not been the victim of a crime. Both parties then agreed on and selected the first panel of jurors which consisted of four jurors, three of whom were African-American.

The State then exercised its third peremptory challenge against venireperson L.H., an African-American, who testified that she works with children as a group worker's aid. After the State exercised a peremptory challenge against her, defense counsel raised a *Batson* claim, arguing that a *prima facie Batson* claim had been established based on the State's use of all three of its peremptory challenges against African-Americans. The following colloquy took place between the trial court and the State:

"THE COURT: I agree [that three of the four of the jurors in the first panel are African-American], and it is a consideration. All of the challenges have been against African-Americans. That's a consideration also. And I think it is the primary consideration to be addressed.

And I will say as to Mr. T***, I understand it. I understand and believe that there is a [race-]neutral basis for challenging Mr. T***. But as to Ms. H***, Ms. W***, an argument might be made without challenging these people, we would now have in a second panel 3/4ths of that panel may be African-American

11

as well. And so I await an explanation concerning Ms. W*** and [Ms.] H***.

\*\*\*

THE STATE: Okay. Well first of all, as far as the reason for excusing these jurors, there's an abundance of people who work in the case worker field, the social worker field. We have only seven peremptories. We can't strike every social worker. But people in that field \*\*\* I would think would be sympathetic to the defense. \*\*\* [T]his is a case that involved someone who was a patient at a hospital, being cared for at a hospital while he was admitted. So the primary reason is people in the social work field. Ms. H*** is a young woman who works in that field that seems like she would be sympathetic to a patient in a hospital.

As far as Ms. W***, she is a case worker in the same field that would be sympathetic with the issues in this case."

In response, defense counsel stated that the State accepted venireperson E.V., a non-African-American, who testified that she has been a caseworker for the Department of Human Services for 22 years, is married to a caseworker in a supervisory position, has four children, and had been a victim of sexual abuse as a child and a victim of domestic violence. Defense counsel also stated that the State accepted venireperson D.J., a non-African-American, whom defense counsel argued could be considered a caseworker because she testified that she is employed as a supervisor with the Illinois Action for Children, which subsidizes child care.

The State asserted that E.V. and D.J. were employed in supervisory positions "as opposed to working in the field." Defense counsel responded that E.V. had testified that she was a

caseworker and that her husband was a caseworker in a supervisory position. The trial court stated as follows:

"THE COURT: From what I know of the case, I don't know that one culture would be predisposed. *** [I]t's not a police case, so I don't know that one culture would be more suited for the defense case or the prosecution case, regarding what I expect the testimony to be."

The trial court found that the State reasons for challenging V.W. and L.H. were race-neutral reasons and allowed the challenges over defense counsel's objections. The parties then selected the second panel of jurors, which consisted of three jurors. E.V. was not selected to the jury, but D.J. was selected to the jury. A second pool of venirepersons were sworn in and interviewed and another 7 venirepersons were selected to the jury, for a total of 12 jurors and 2 alternates. The ratio of African-American jury panel members to non-African-American jury panel members is not clear from the record, nor is that ratio discussed in the parties' appellate briefs.

At trial, the State called five witnesses in its case-in-chief. The witnesses included Catalla and Giles, the victims; Osarosemwen Erhabor, a counselor in the psychiatric unit; Yvonne Arrington, the charge nurse in the psychiatric unit; and Dr. Salud Martinez, Catalla's treating medical physician.

Catalla testified that on October 23, 2006 she was working as a staff nurse distributing medication to patients in the psychiatric unit of Lincoln Park Hospital. She described the psychiatric unit as being divided into two wings, a "general care" wing, which she testified was for

13

patients requiring "less supervision," and a "special care" wing for patients requiring "more supervision." She testified that on that day she was assigned to the general care wing and heard a commotion in the special care wing.

Catalla testified that she then heard a "code gray" announced over the psychiatric unit's loudspeakers. She testified that a code gray is a warning to unit's staff members that a psychiatric patient is "out of control" and that all available staff members in that unit must respond to assist in restraining or secluding the patient from other patients. She testified that, after she heard the announcement, she left the general care wing and entered the special care wing, where she observed defendant talking to his mother on a hospital telephone located in a hallway. She testified that defendant appeared "very angry, very hostile, totally out of control." She also testified that she heard defendant using racial slurs and threatening staff members.

Catalla testified that other staff members responded to the code gray announcement, including Arrington, Erhabor, and Giles. Catalla testified that she attempted to talk with defendant to calm him, but defendant continued to shout into the telephone, "they want to give me a shot!" She testified that she had observed defendant shouting for approximately 10 to 15 minutes, but that another, unnamed, staff member informed her that defendant had been shouting for approximately one hour.

Catalla testified that she then devised a plan to physically move defendant into a "quiet room" to seclude defendant from the other patients in the special care unit. She testified that she planned to use a three- to four-inch thick twin-sized mattress as a shield so that she and the other staff members could come close enough to defendant to immobilize him by grabbing his arms and

14

legs and then move him into the quiet room. Catalla testified that she, Arrington and Giles held the mattress while Erhabor walked alongside of them as they approached defendant. She testified that she was unclear as to what happened after they came close to defendant because the next thing she remembered was that she woke up in the hospital's emergency room.

The State then offered into evidence three photographs of Catalla, without objection. The trial court received the photographs into evidence and they were published to the jury. Catalla testified as a foundation that the three photographs were taken on October 24, 2006, at the hospital and accurately depicted the injuries to her face on that date.

Giles testified that he responded to the code gray announcement and observed defendant talking on a telephone at the end of a hallway and shouting at staff members. He testified that the staff members told him that they planned to use a mattress as a shield in order to approach defendant.

Giles testified that he assisted the staff members in approaching defendant with the mattress. He testified that when they drew near, defendant "bolted out" from behind the mattress and struck him twice in the head. He testified defendant "knocked" him and Catalla to the floor and that he became unconscious after he fell to the floor.

The State offered into evidence four photographs of Giles, without objection. The trial court received the photographs into evidence and they were published to the jury. Giles testified as a foundation that the three photographs were taken on October 23, 2006, at the Chicago police department and accurately depicted the injuries to his face on that date.

Erhabor testified that he accompanied the staff members who approached defendant with

15

the mattress. He testified that as they approached, defendant struck Catalla and Giles with his hands and fists. He testified that defendant struck Catalla "multiple times." He testified that she then fell to the floor and appeared "unresponsive." Erhabor also testified that defendant struck Giles multiple times and Giles also fell to the floor. He further testified that defendant started kicking Catalla and Giles in the face as they lay on the floor.

Arrington testified that she accompanied the staff members who approached defendant with the mattress. She testified that defendant came around the other side of the mattress and struck Catalla and Giles until they fell to the floor. She testified both of them appeared unconscious and defendant began "kicking and stomping them." She testified that she threw herself over Catalla's body and screamed for defendant to stop. She testified that "[a]fter a point, [defendant] just froze in his tracks," looked around, and then ran to the other end of the hallway. She testified that defendant was later restrained by police officers.

When the State called Dr. Salud Martinez as a witness, defense counsel requested a sidebar conference. At the sidebar conference, defense counsel informed the trial judge that they had not received Dr. Martinez's *curriculum vitae* (CV) as they had previously requested. Prior to trial, defendant had filed a "Motion for Discovery" requesting the State to disclose, *inter alia*, a list of all statements by persons whom the State may call as a witness, and "[a]ny reports or statement of experts made in connection with the particular case." The State responded that Dr. Martinez was not going to provide an expert opinion, only the medical testimony of a treating "medical doctor" concerning the injuries Catalla sustained and the course of her treatment. The trial court allowed Dr. Martinez to testify over defense counsel's objection.

Dr. Martinez testified that she is a "general practitioner, family practice." She testified that she graduated from the University of Santa Tomas in the Philippines and did her residency training at Lincoln Park Hospital. She further testified that she is licensed to practice medicine in Illinois and is an attending physician at Lincoln Park Hospital where she has a private practice.[1]

Dr. Martinez testified that Catalla had been her patient since 2002. She testified that the hospital's emergency room staff contacted her at her home on the evening of October 23, 2006, to inform her that Catalla's medical condition required admittance to the hospital. She testified that she instructed the emergency room staff to admit Catalla and arrived the following day to examine her.

Dr. Martinez testified, without objection, that Catalla told her she was suffering from a headache, had blurry vision, pain in left chest, left arm, and "some weakness" of the left hand. She testified that Catalla told her she had been injured at work. Dr. Martinez observed that Catalla had swelling and abrasions to the left side of her face, a bruise around the left eye, and "also some subconjunctival hemorrhage" in her left eye which she defined as bleeding inside her eye.

Dr. Martinez also testified, without objection, to the medical treatment Catalla received in the emergency room. She testified that Catalla had received pain medication for her headache, and that she was given magnetic resonance imaging (MRI) and a computerized axial tomography

---

[1] The record does not state whether Dr. Martinez is board certified in a specific specialty of medicine.

(CAT) scan, which, she testified, "was negative for any hemorrhage or mass or anything." She did not testify to the results of the MRI. Dr. Martinez also testified, without objection, that she examined Catalla the following day with the use of a magnetic resonance angiography (MRA) to check for bleeding inside her eye. She did not testify concerning the results of the MRA.

Dr. Martinez testified, without objection, that she consulted with a hospital neurologist and that after the neurologist's examination, Catalla was prescribed "pills *** for Namenda" which Dr. Martinez testified "is for kind of increase of the memory *** because [Catalla] could hardly remember what exactly happened."

Dr. Martinez testified that she diagnosed Catalla with a concussion. She also testified that "[t]here was no bleeding [s]o we call that concussion secondary to some kind of trauma to the head."

The State further asked Dr. Martinez to describe Catalla's demeanor and "how she was acting" on October 24, 2006. Dr. Martinez testified without objection that Catalla appeared scared and that she "could hardly remember." Dr. Martinez further testified without objection that Catalla told her that she still suffered from headaches, blurry vision, weakness in her arm, and pain in her chest and arm, and that she "could hardly sleep."

The State asked Dr. Martinez whether Catalla continued to suffer from her injuries when she was discharged from the hospital on October 26. Defense counsel objected based on relevance and hearsay. The trial court overruled the objection and Dr. Martinez responded that Catalla still complained to her that she continued to suffer from headaches, nervousness, lack of sleep and anxiety. Dr. Martinez also testified that she requested a hospital psychiatrist to examine

Catalla before she was discharged and that the psychiatrist prescribed Effexor, which is "like a stimulant." When asked by the State to how Effexor works, defense counsel objected without a basis and the trial court overruled the objection. The trial court allowed Dr. Martinez to respond "if she knows." Dr. Martinez stated that "when [a person is] depressed, [Effexor] increase[s] [the person's] personality a little."

Dr. Martinez further testified, without objection, that Catalla received "transcent (phonetic), something to relax, like a Valium, *** something for pain, [and] eye drops" when she was discharged from the hospital. She also testified that she referred Catalla to a psychiatrist and a "specialist for the eyes."

The State showed Dr. Martinez the three photographs of Catalla previously received into evidence. Dr. Martinez described the injuries to Catalla's face that were depicted in the photographs.

On cross-examination, defense counsel questioned Dr. Martinez concerning Catalla's treatment after she was discharged from the hospital. Dr. Martinez testified that she examined Catalla approximately every two weeks following her discharge up to the time of trial. She further testified that she submitted to Catalla's employer, Lincoln Park Hospital, periodic medical reports to document Catalla's injuries and her inability to return to work.

Defense counsel requested a sidebar conference and claimed that State failed to tender the medical reports. The State responded as follows:

"THE STATE: Judge, we have complied with our discovery. We have subpoenaed the records of [Dr. Martinez]. We tendered everything we have

regarding the treatment of Catalla. The defense has also subpoenaed these records. *** The fact that [Catalla] continues to see a doctor through today's date *** is not a discovery violation. They have a record of the injuries she sustained as a result of this. They are aware of the extent of the injuries she received on October 23rd, 2006. That information has been disclosed. There is no surprise or anything new here."

Defense counsel did not request a continuance, but made an oral motion for a mistrial, which the trial court denied.

After the State rested, the defense made a motion for a directed verdict, which was denied. Defense counsel then proceeded with defendant's defense. The parties stipulated that if Chicago police detective Frank Esposito were called to testify, he would testify that he was assigned to investigate the matter and that he interviewed Catalla and Giles on October 24, 2006.

Esposito would testify that Catalla told him that defendant was talking on the telephone to his mother when the incident began, and that Catalla tried to persuade defendant to hang up the telephone and to take his medication, but he refused. Catalla "talked to [defendant] for approximately 20 minutes." The code gray was then announced and Giles arrived. Catalla and Giles then jointly "tried to persuade [defendant] to hang up the telephone and take his medication, but he refused." Catalla and Giles then "picked up a mattress in an attempt to push [defendant] away from the [telephone] and gain control of him."

Defendant did not testify on his own behalf, and the defense rested. The parties made closing arguments and following jury deliberations, the jury found defendant guilty on the three

counts of aggravated battery. Defendant filed a posttrial motion which the trial court denied at a sentencing hearing on December 2, 2008. After a hearing on aggravation and mitigation, the trial court sentenced defendant to three concurrent terms of five years' imprisonment in the Illinois Department of Corrections.

On December 18, 2008, defense counsel filed a motion for the trial court to reconsider defendant's sentence. The trial court held a hearing on that motion on February 18, 2008. During that hearing, defendant interjected, "[Go on] give me the lethal injection. I don't want to go through this shit. Just [go on] and kill me." The trial court had defendant taken back to his holding cell and then stated as follows:

> "THE COURT: During the pendency of this case, I have watched Mr. Taylor dwindle away to a shell of the person that he once was. I don't know what's the cause of this. But I do not believe sentencing is intended to be cruel and unusual in any way. I believe that's the effect it's having on Mr. Taylor."

The trial court then reduced Taylor's sentence to 3 concurrent terms of 3 years' imprisonment with credit for 850 days for time considered served.

This appeal follows.

## II. ANALYSIS

On appeal, defendant seeks reversal of his convictions, claiming that the trial court: (1) failed to conduct a proper fitness hearing and, as a result, abused its discretion in finding defendant fit to stand trial; (2) erred and violated *Batson v. Kentucky*, 476 U.S. 79 (1986), when the State exercised two of its peremptory challenges to purposefully exclude two African-

American venirepeople from the jury; (3) failed to comply with the mandate of Supreme Court

Rule 431(b) (Ill. S. Ct. R. 431(b) (eff. May 1, 2007)); and (4) improperly allowed the State to

present the testimony of one of the victim's medical physicians because: (a) the State failed to

disclose "a statement of the doctor's qualifications" as an expert in violation of Supreme Court

Rule 412 (Ill. S. Ct. R. 412 (eff. Mar. 1, 2001)); (b) the medical physician's testimony concerning

"the victim's psychological injuries was irrelevant"; (c) the medical physician's testimony

"contained inadmissible hearsay concerning medications prescribed by a psychiatrist and

neurologist"; and (d) the State failed to lay a proper foundation for the medical physician's

testimony "concerning the medications prescribed to [the] victim."

## A. Proper Fitness Hearing

First, defendant claims that a new trial is warranted because the trial court erred when it

failed to: (1) conduct an adequate fitness restoration hearing; and (2) failed to *sua sponte* order a

new fitness evaluation when there existed a *bona fide* doubt that he was fit to stand trial.

## 1. Fitness Restoration Hearing

The due process clause of the fourteenth amendment of the United States Constitution

bars the criminal prosecution of a defendant who is not competent to stand trial. U.S. Const.,

amend. XIV; *Medina v. California*, 505 U.S. 437, 439 (1992); *People v. Mitchell*, 189 Ill. 2d

312, 326 (2000). A defendant is presumed to be fit to stand trial. 725 ILCS 5/104-10 (West

2008). A defendant is unfit if he is unable to understand the nature and purpose of the

proceedings against him or to assist in his defense. 725 ILCS 5/104-10 (West 2008); *People v.

Eddmonds*, 143 Ill. 2d 501, 512 (1991). "Fitness speaks only to a person's ability to function

within the context of trial; it does not refer to sanity or competence in other areas." *People v. Coleman*, 168 Ill. 2d 509, 524 (1995). A person may be fit for trial although his mind may be otherwise unsound. *Coleman*, 168 Ill. 2d at 524. When a defendant is found unfit and treatment has been ordered, a trial judge must periodically review the issue of defendant's fitness to stand trial and set the matter for a hearing upon receiving a report that defendant has attained fitness. 725 ILCS 5/104-20(a) (West 2008).

At a hearing to determine defendant's fitness to stand trial, the trial court may conduct its own inquiry into the defendant's fitness. 725 ILCS 5/104-11(c) (West 2008). Where the parties stipulate to what an expert would testify, the trial court may consider this stipulated testimony in reaching its determination of defendant's fitness. *People v. Lewis*, 103 Ill. 2d 111, 116 (1984). However, the defendant's fitness may not be determined solely on the parties' stipulation to the expert's *conclusions* that defendant is fit to stand trial. *Lewis*, 103 Ill. 2d at 116; *People v. Contorno*, 322 Ill. App. 3d 177, 179 (2001). "Upon considering these stipulations and personally observing defendants, the [trial] court could find defendant[] fit, seek more information, or find the evidence insufficient to support a finding of restoration to fitness." *Lewis*, 103 Ill. 2d at 116. A trial court's determination that a defendant is fit to stand trial will not be reversed absent an abuse of discretion. *People v. Sandham*, 174 Ill. 2d 379, 382 (1996); *People v. Baugh*, 358 Ill. App. 3d 718, 732 (2005); *People v. Cleer*, 328 Ill. App. 3d 428, 431 (2002); *People v. Newell*, 196 Ill. App. 3d 373 (1990).

As an initial matter, the State argues that the defendant forfeited this issue because he did not raise it at trial or in his posttrial motion. However, the plain-error doctrine bypasses normal

forfeiture principles and allows a reviewing court to consider unpreserved error when either (1) the evidence is close, regardless of the seriousness of the error; or (2) the error is serious, regardless of the closeness of the evidence – so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process. *People v. Piatkowski*, 225 Ill. 2d 551, 564-65 (2007), citing *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005). The burden of persuasion remains with the defendant. *Herron*, 215 Ill. 2d at 186-87. In order to determine whether plain-error is applicable, we must first determine whether any error occurred. *Piatkowski*, 225 Ill. 2d at 559.

The evidence was overwhelming that defendant was restored to fitness to stand trial with medication. Dr. Kulik interviewed the defendant and made a finding that the defendant manifested an understanding of the legal proceedings and demonstrated an ability to assist his counsel in his defense. See 725 ILCS 5/104-10 (West 2008) (requiring defendant to understand the legal proceedings and assist counsel in his defense). Dr. Kulik formulated a diagnosis of defendant's mental disorders and provided the medication regimen prescribed to the defendant to stabilize those mental disorders. Dr. Kulik further provided a prognosis that defendant was "[faring] well" with his medication regimen and opined that defendant did not suffer adverse effects from the medication. The defendant was further evaluated by Dr. Nadkarni whose findings were similar to Dr. Kulik's findings and opinions, and he also found defendant was restored to fitness to stand trial with medication. In addition, defense counsel had an independent evaluation of his client by a private psychiatrist who also opined that defendant was restored to fitness to stand trial with medication.

24

Moreover, the record shows that defendant was present at each pretrial proceeding, and the trial court had numerous opportunities to observe defendant. There is no evidence in the record that defendant disrupted the proceedings and there is also no evidence in the record that defense counsel alerted the trial court that defendant was unwilling or unable to assist in his defense.

Defendant argues that this case is similar to *People v. Esang*, 396 Ill. App. 3d 833 (2009). In *Esang*, the trial court questioned the defendant's fitness to stand trial based on his actions during pretrial proceedings and ordered a clinical examination. *Esang*, 396 Ill. App. 3d at 836. The defendant refused to cooperate during the fitness examination and the evaluating psychiatrist opined he was unfit to stand trial. *Esang*, 396 Ill. App. 3d at 836. A jury heard the evidence of defendant's fitness and then found defendant unfit to stand trial. *Esang*, 396 Ill. App. 3d at 836. They also found that there was a substantial probability that, if provided with treatment, he would attain fitness within one year. *Esang*, 396 Ill. App. 3d at 836. The defendant was then placed in the custody of the Department of Mental Health and Developmental Disabilities. The defendant continually objected to further fitness proceedings, insisting that he was fit to stand trial and that the proceedings merely delayed the presentation of his defense on the criminal charges. *Esang*, 396 Ill. App. 3d at 836.

Months later, the trial court received a "90-day evaluation" report concerning defendant's fitness to stand trial submitted by a psychologist and a psychiatrist that interviewed the defendant. The evaluation report indicated that defendant " 'vehemently refused all psychotropic medication,' " but nevertheless concluded that defendant was fit to stand trial. *Esang*, 396 Ill.

App. 3d at 836-37.

The trial court then held a restoration fitness hearing in which it stated to defendant, "[i]n order to put the case back on the trial calendar, we must restore you to fitness, which can be done simply by stipulating to [the written evaluation]." The trial court asked the defendant whether he was "in concurrence" with the psychiatrists' opinion, to which the defendant responded that he was. The trial court then found defendant fit to stand trial and appointed the office of the public defender to represent him at trial. The assistant public defender later advised the trial court that the defendant refused to assist in his defense. The trial court again questioned defendant's fitness to stand trial and ordered another clinical evaluation. *Esang*, 396 Ill. App. 3d at 837.

On appeal, this court found that the trial court failed to independently analyze and weigh expert testimony in finding defendant fit at the first restoration fitness hearing and appeared to base its finding that the defendant was restored to fitness solely on the "defendant's stipulation" to the psychiatric conclusions in the written evaluation. *Esang*, 396 Ill. App. 3d at 837.

We first stated that the trial court's acceptance of defendant's opinion that he was able to cooperate with counsel made a "sham of out the [restoration fitness] hearing" because the defendant's statements were unreliable because the written evaluation stated defendant refused all psychotropic treatments suggested and that his condition had minimally changed from the earlier finding that he was unfit to stand trial. *Esang*, 396 Ill. App. 3d at 840 (citing *People v. McKinstray*, 30 Ill. 2d 611, 616-17 (1964)). We further found that the trial court indicated a "clear doubt" concerning the defendant's fitness to stand trial both before and after the first restoration hearing. *Esang*, 396 Ill. App. 3d at 840.

The case at bar is distinguishable from *Esang*. First, there was no indication in the record that the trial court questioned defendant's fitness to stand trial or *sua sponte* ordered an evaluation in response to its observations of defendant during pretrial proceedings. Second, the written evaluations of Dr. Kulik and Dr. Nadkarni, unlike the written evaluation in *Esang*, indicated that defendant cooperated during the evaluation and responded well to his medication. Third, as previously noted, the record does not show that the parties merely stipulated to Dr. Kulik's conclusion that defendant was restored to fitness with medication, but that they stipulated to Dr. Kulik's basis for his conclusions. Also Dr. Nadkarni testified to his conclusions. Fourth, as previously noted, there is nothing in the record that indicates that defendant refused to assist counsel in his defense at any time prior to trial.

Defendant also argues that the record shows that the trial court based its finding of fitness solely on the conclusions of Dr. Kulik because it did not make any oral or written finding concerning defendant's fitness, but merely set the matter for trial. However, "we are aware of no statute or supreme court rule that requires trial courts to either independently question a defendant or make express findings of fact regarding fitness." *People v. Goodman*, 347 Ill. App. 3d 278, 287 (2004). In addition, as we have previously noted, the trial court had the benefit of Dr. Nadkarni's testimony and the statement of defense counsel that defendant's private evaluation by their own psychatrist mirrored that of Dr. Kulik and Dr. Nadkarni. We cannot find any error in the trial court's handling of the fitness matter.

### 2. *Bona Fide* Doubt

Furthermore, we cannot find that the trial court erred in failing to *sua sponte* ordering a

new fitness evaluation and hearing.

Defendant claims that the evidence that shows that there was a *bona fide* doubt of his fitness was his decision to waive an insanity defense and his unwillingness to assist in the preparation of that defense. *People v. Griffin*, 178 Ill. 2d 65 (1997) (once a *bona fide* doubt as to defendant's fitness has been raised, the trial court has a duty to hold a fitness hearing). Defendant bears the burden of proving there is a *bona fide* doubt of fitness and "must demonstrate that facts existed at the time of his trial which raised a *bona fide* doubt of his ability to understand the nature and purpose of the proceedings and to assist in his defense." *People v. Eddmonds*, 143 Ill. 2d 501, 512-13 (1991).

The trial court determined that defendant properly waived an insanity defense after it held a hearing, at defense counsel's request and pursuant to *People v. Gettings*, 175 Ill. App. 3d 920 (1988), to determine whether defendant could waive an insanity defense.

In *Gettings*, the Fourth District of the Illinois Appellate Court found that when a trial court is advised by defense counsel that a competent defendant has decided to waive a viable insanity defense, over defense counsel's objection, the court must ascertain whether the waiver is voluntary and intelligent before it is accepted. *Gettings*, 175 Ill. App. 3d at 924. The *Gettings* court ruled that the trial court must then discuss with the defendant whether or not the defendant has been advised of the availability of the defense; what reason the defendant has for waiving the defense; whether or not the defendant understands the consequences of waiving an insanity defense; and, whether or not defendant understands the consequences of a successful insanity defense. *Gettings*, 175 Ill. App. 3d at 925.

In this case, the trial court advised the defendant of the insanity defense and inquired to the reason defendant had for waiving it. Defendant repeatedly asserted that he did not intend to hurt anyone, but acted solely in self-defense. Defendant further insisted that he was innocent of the charges against him and did not want to assert an insanity defense. Defendant was also frightened of a previous mental health facility where he had been confined and did not want to return to a similar facility. Defendant was admonished of the consequences of his decision by his defense counsel and the trial court.. As a result, the evidence shows the trial court properly followed the requirements in *Gettings* and found defendant waived the insanity defense voluntarily and intelligently. *Gettings*, 175 Ill. App. 3d at 924.

We also cannot find that defendant's refusal to raise an insanity defense evidenced an unwillingness to assist defense counsel. In this case, defendant was admonished of the consequences of his decision by his defense counsel and the trial court, and he clearly chose not to assert an insanity defense, which was his right to do. *People v. Ramey*, 152 Ill. 2d 41, 53-54 (1992) (a defendant has the right to choose which defense theory to present to the trier of fact).

Defendant further claims the remarks made by defendant at the hearing to reconsider his sentence on February 18, 2008, to "[Go on] and kill me" as evidence that indicated a *bona fide* doubt of defendant's fitness. Defendant also points to the trial judge's remarks at that same hearing concerning defendant's "deteriorated mental state" as further support of a *bona fide* doubt of defendant's fitness. Those remarks occurred approximately four months after defendant's trial.

However, we find no evidence, and defendant does not cite any, that shows the remarks

alerted the trial court that defendant was unable to understand the proceedings or assist in his defense at any point during the trial such that the trial court was required to *sua sponte* order another psychiatric evaluation and hold a fitness hearing.

In sum, the trial court did not commit error in conducting the fitness restoration hearing or by failing to *sua sponte* order a new fitness evaluation and hearing. Where "there is no error at all," there cannot be plain error analysis. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005). Accordingly, this claim is forfeited.

### B. *Batson* Claim

Second, defendant claims that a new trial is warranted because the State used its peremptory challenges to exclude two African-American jurors from the jury in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986).

In *Batson*, the United States Supreme Court held that the fourteenth amendment's equal protection clause prohibits the State from using a peremptory challenge to exclude a prospective juror solely on the basis of race. *Batson*, 476 U.S. at 89. Under *Batson*, the equal protection clause of the fourteenth amendment is violated where the facts show that the State excluded an African-American venireperson on the assumption that the person will be biased in favor of defendant simply because of their shared race. *Batson*, 476 U.S. at 97.

The United States Supreme Court provided a three-step analysis for evaluating claims of discrimination in jury selection. *Rice v. Collins*, 546 U.S. 333, 338 (2006). First, the moving party has the burden to show that the nonmoving party exercised its peremptory challenge on the basis of race. *Rice*, 546 U.S. at 338 (citing *Batson*, 476 U.S. at 96-97); *People v. Easley*, 192 Ill.

2d 307, 323 (2000). If a *prima facie* case is made, the process moves to the second step where the burden of persuasion shifts to the nonmoving party to present a race-neutral reason for excusing the venireperson. *Rice*, 546 U.S. at 338 (citing *Batson*, 476 U.S. at 97-98); see also *Easley*, 192 Ill. 2d at 323-24. "Although the prosecutor must present a comprehensible reason, 'the second stop of this process does not demand an explanation that is persuasive, or even plausible'; so long as the reason is not inherently discriminatory, it suffices." *Rice*, 546 U.S. at 338 (quoting *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995) (*per curiam*)).

Once the nonmoving party presents its reason for excusing the venireperson in question, the process moves to the third step in the analysis. In that third step, the trial court must determine whether the moving party has sustained its burden of establishing purposeful discrimination. *Rice*, 546 U.S. at 338 (citing *Batson*, 476 U.S. at 98). "This final step involves evaluating 'the persuasiveness of the justification' proffered by the prosecutor, but 'the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.' " *Rice*, 546 U.S. at 338 (quoting *Purkett*, 514 U.S. at 768).

### 1. *Prima Facie* Case

In determining whether a *prima facie* case of racial discrimination in jury selection has been established, the following relevant circumstances should be considered: (1) the racial identity between the defendant and the excluded venirepersons; (2) the pattern of strikes against African-American venirepersons; (3) the disproportionate use of peremptory challenges against African-American venirepersons; (4) the level of African-American representation in the venire as compared to the jury; (5) the prosecutor's questions and statements during *voir dire* examination

and while exercising peremptory challenges; (6) whether the excluded African-American venirepersons were a heterogeneous group sharing race as their only common characteristic; and (7) the race of the defendant, victim, and witnesses. *People v. Williams*, 173 Ill. 2d 48 (1996); *People v. Hudson*, 157 Ill. 2d 401, 426 (1993); *People v. Andrews*, 146 Ill. 2d 413, 425-26 (1992).

Here, the trial court found that a *prima facie* case of discrimination under *Batson* was established. Our review of the evidence in light of all the relevant circumstances also reveals that a *prima facie* case of discrimination under *Batson* was established. However, defendant does not argue that finding on appeal. Defendant argues that the trial court's determination that the State's race-neutral reasons for excusing two venirepersons was in error.

## 2. Race-Neutral Reasons

Our analysis now focuses on the second step to determine whether the State provided race-neutral reasons for excusing L.H. and V.W.. A race-neutral reason is an explanation based on something other than the race of the venireperson. *Hernandez v. New York*, 500 U.S. 352, 365 (1991).

In the case at bar, the State provided its "primary reason" for excusing L.H. and V.W. was not based on their race, but on their employment in "the social worker field," claiming they could be sympathetic to the defense. Employment in the social work field has been held to be a race-neutral reason for a peremptory challenge. See *People v. Hemphill*, 230 Ill. App. 3d 453, 467-68 (1992) (citing *People v. Mack*, 128 Ill. 2d 231 (1989)) (challenge on the basis of employment positions is a race-neutral reason). The State also provided an additional reason for excusing

L.H., claiming "she is a young woman" [2] and youth as a basis for a peremptory challenge has be held to be a race-neutral reason. See *People v. Taylor*, 171 Ill. App. 3d 261 (1988) (challenge on the basis of youth has been held to be race-neutral).

### 3. Trial Court's Determination

Our analysis now focuses on the third step where the trial court must determine whether defendant has carried his "ultimate burden of persuasion regarding racial motivation." As previously noted, this burden never shifts from the moving party. *Rice*, 546 U.S. at 338 (citing *Purkett*, 514 U.S. at 768).

A trial court's third step finding on the ultimate issue of discrimination rests largely on credibility determinations. *People v. Rivera*, 221 Ill. 2d 481, 502 (2006) (citing *McDonnell v. McPartlin*, 192 Ill. 2d 505, 527 (2000)). Consequently, the trial court's finding is entitled to "great deference" and will not be set aside unless clearly erroneous. *Hernandez*, 500 U.S. at 365; *Rivera*, 221 Ill. 2d at 502; *McDonnell*, 192 Ill. 2d at 527; *People v. Munson*, 171 Ill. 2d 158, 175 (1996). As the United States Supreme Court observed in *Hernandez*, there will seldom be much evidence bearing upon the ultimate question of discrimination and the "best evidence often will be the demeanor of the attorney who exercises the challenge." *Hernandez*, 500 U.S. at 365. The evaluation of the attorney's state of mind is most often "based on demeanor and credibility" and thus "lies 'peculiarly within the trial judge's province.'" *Hernandez*, 500 U.S. at 365 (quoting *Wainwright v. Witt*, 469 U.S. 412, 428 (1985)).

---

[2] The record and the parties' appellate briefs do not indicate L.H.'s age.

Following the State's reasons for excluding L.H. and V.W., defense counsel argued that the State's reasons were pretextual. Specifically, defense counsel pointed to the State's acceptance of venireperson E.V., a non-African-American, who testified that she is a case worker and venireperson D.J., a non-African-American, whom defense counsel argued "could be considered" a social worker because she is employed as a supervisor with the Illinois Action for Children, which subsidizes child care.

The State responded that E.V. and D.J. were employed in supervisory positions "as opposed to working in the field," although, as defense counsel correctly pointed out, E.V. testified that she was a caseworker and that it was her husband who held a supervisory position.

We cannot say that the trial court's determination that defendant failed to establish purposeful discrimination was clearly erroneous. We first consider that at the time defendant raised his *Batson* claim, the parties had agreed on and selected the first panel of jurors which consisted of four jurors, three of whom were African-American. Next, as noted, the State provided valid race-neutral reasons for excusing L.H. and V.W. based on their employment as social workers and L.H.'s youth. In addition, the State provided an additional reason for excusing some, but not all, social workers from the venire, namely, that it had only seven peremptories and social workers were in "abundance," so it could not excuse every social worker.

As noted, defense counsel argues that the State's reasons were nevertheless pretextual because it accepted venirepersons E.V. and D.J., who were non-African-American social workers, but excused L.H. and V.W., who were African-American social workers.

Even assuming that L.H., V.W., E.V. and D.J. all shared the same trait as "social

34

workers," the mere fact that the State challenges a African-American venireperson for a reason which is equally applicable to a non-African-American juror does not show in and of itself that the offered explanation is pretextual. *People v. Hudson*, 157 Ill. 2d 401, 431 (1993). A peremptory challenge may be based on a combination of traits. *Hudson*, 157 Ill. 2d at 431. As the Illinois Supreme Court has stated:

"[I]n many instances there will be no single criterion that serves as the basis for the decision whether to excuse a particular [venireperson]. A characteristic deemed to be unfavorable in one prospective juror, and hence grounds for a peremptory challenge, may, in a second prospective juror, be outweighed by other, favorable characteristics." *People v. Mack*, 128 Ill. 2d 231, 239 (1989).

In this case, the evidence in the record showed that L.h. was not only excused based on her employment as a social worker, but also excused based on her youth, which, as noted, is a race-neutral reason for exclusion. *Taylor*, 171 Ill. App. 3d at 268. Defendant does not argue that youth was a trait possessed by either E.V., D.J., or V.W.. Furthermore, D.J. was employed in a supervisory position, which was not a trait possessed by either L.H., V.W., or E.V..

While defendant correctly points out that E.V. testified that she is employed as a "caseworker" similar to V.W, E.V. also testified during *voir dire* to a number of traits different than those of V.W.. E.V. testified that she is a caseworker, has been employed in the same position for 22 years, she is married to another caseworker who holds a supervisory role, she has four children, and she has been the victim of domestic violence and was also a victim of sexual assault as a child. V.W., on the other hand, testified that she is a case worker, attends church

regularly, is unmarried, has no children, and has never been the victim of a crime. Clearly there were other traits that the State may have considered in not challenging E.V.. See, *e.g.*, *People v. Mack*, 128 Ill. 2d 231, 243 (1989) ("other circumstances may have led prosecutors not to challenge" white venirepersons possessing the same traits as challenged African-American venirepersons).

The trial court also found defense counsel's concern that the State's reasons were pretextual unfounded because there was no indication that "one culture would be predisposed" and "more suited for the defense case or the prosecution case" and found that the State provided race-neutral reasons for excusing L.H. and V.W. Although the makeup of the jury was not found in the record on appeal, the fact that three out of the four jurors selected on the first panel were African-American show that the State had already agreed on a jury with strong African-American representation.

Our review of the evidence in light of all the relevant circumstances reveals that defendant did not meet his "ultimate burden of persuasion regarding racial motivation." Given the "great deference" accorded to the trial court's ruling and based on our review of the evidence, we cannot find that the trial court's determination that there was no intentional discrimination was clearly erroneous.

### C. Supreme Court Rule 431(b)

Third, defendant claims that he was denied his right to a fair and impartial jury because the trial judge failed to question the prospective jurors regarding all four principles enumerated in *People v. Zehr*, 103 Ill. 2d 472 (1984), and codified in Supreme Court Rule 431(b) (Ill. S. Ct. R.

431 (eff. May 1, 2007)). Under that rule, the trial court must ask jurors whether they understand and accept that: (1) defendant is presumed innocent of the charges against him; (2) the State must prove defendant guilty beyond a reasonable doubt; (3) defendant is not required to present evidence on his behalf; and (4) defendant has the right not to testify and his failure to do so cannot be held against him. Ill. S. Ct. R. 431(b) (eff. May 1, 2007). Specifically, defendant argues that he was prejudiced where the trial court failed to admonish the potential jurors regarding defendant's right not to testify.

The State claims that defendant forfeited review of this error because he failed to object at trial or raise it in a posttrial motion. To preserve a claim for review, a defendant must both object at trial and include the error in a written posttrial motion. *People v. Woods*, 214 Ill. 2d 455, 470 (2005); *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Defendant admits that he failed to properly preserve this issue for appeal, but urges us to review the error under the plain-error doctrine.

"[T]he plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005). Under the first prong, the defendant must show that the evidence at trial was so closely balanced that the error alone "threatened to tip the scales of justice against him." *Herron*, 215 Ill. 2d at 187. Under the second prong, the defendant must prove that the error was so serious that it affected the fairness of the trial and questions the integrity of the judicial process. *Herron*, 215 Ill. 2d at 187. Under either prong of a plain-error analysis, it is the defendant rather than the State who bears the burden of persuasion. *United*

*States v. Olano*, 507 U.S. 725, 734 (1993); *Herron*, 215 Ill. 2d at 187.

However, before considering plain error, we must first determine whether an error occurred at all. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (in order to claim plain error, defendant must show "first" that an error occurred). Here, there is no dispute that the trial court erred in failing to strictly comply with Rule 431(b) when it failed to even discuss with the venire that defendant's failure to testify cannot be held against him.

In his appellate brief, defendant claims that this violation of Rule 431(b) falls under the second prong of plain error because it constitutes a structural error requiring automatic reversal. However, after defendant filed his appellate brief, the Illinois Supreme Court decided *People v. Thompson*, 238 Ill. 2d 598 (2010). In *Thompson*, our supreme court found that a trial court's violation of Rule 431(b) "does not fall within the very limited category of structural errors and, thus, does not require automatic reversal of defendant's conviction." *Thompson*, 238 Ill. 2d at 611. In addition, defendant does not claim that the trial court's failure to strictly comply with Rule 431(b) resulted in a biased jury. *Thompson*, 238 Ill. 2d at 614 ("[a] finding that defendant was tried by a biased jury would certainly satisfy the second prong of plain-error review because it would affect his right to a fair trial and challenge the integrity of the judicial process"). Accordingly, we do not find that the trial court's Rule 431(b) violation in this case warrants automatic reversal of defendant's conviction.

In his reply brief, which defendant filed after the *Thompson* decision, he claims that we should now consider the error under the first prong of plain error because the evidence at trial was closely balanced. In support of his argument defendant argues that the evidence was close

concerning his intent and the element of great bodily harm. As to intent, defendant argues that the "jury could have believed" that because he was in a psychiatric ward and "had a fear of being medicated," he reasonably acted in self-defense. As to the element of great bodily harm, defendant argues that the "jury may have believed" that Catalla suffered only bodily harm and not great bodily harm after considering Catalla's testimony that she was punched and kicked several times and the photographs entered into evidence that "show only a bruised eye."

We do not find defendant's argument, that the evidence was closely balance, persuasive. At trial, Catalla testified that defendant was "out of control" and that a code gray was called as a result. Catalla testified that she tried to calm defendant by speaking with him, but he would not calm down. Catalla testified that she and other staff members approached defendant with a mattress in an attempt to physically restrain him, but she was unable to remember the events that followed because she woke up in the emergency room.

Giles also testified that defendant moved around the mattress as they approached and punched and kicked Catalla and Giles until they both fell to the floor. Giles further testified that defendant continued to kick and stomp on them while they were on the floor. Giles testified that both Catalla and Giles were rendered unconscious as a result of the beating.

In addition, Erhabor and Arrington also testified at trial. They both testified that they observed defendant punch Catalla and Giles until they fell to the floor. They also testified that defendant continued to kick Catalla and Giles while they were on the floor and that both Catalla and Giles fell unconscious during the attack.

Furthermore, Dr. Martinez testified to the extent of the injuries that Catalla suffered as a

result of the attack. She testified that when she examined Catalla in the hospital she observed that Catalla had bruising around her eye and lacerations on the left side of her face. Dr. Martinez further testified that Catalla complained of headaches and pain on the left side of her face and chest. Dr. Martinez further testified that she diagnosed Catalla with a concussion.

In sum, we find that defendant has not shown that the evidence was closely balanced on any of the elements of the offense for which he was convicted. Thus, the error did not rise to the level of plain error, under either prong of the plain-error doctrine.

### D. Dr. Martinez's Testimony

Fourth, defendant claims that the trial court improperly allowed the State to present the testimony of one of the victim's treating medical physicians because: (a) the State failed to disclose "a statement of the doctor's qualifications" as an expert in violation of Supreme Court Rule 412 (Ill. S. Ct. R. 412 (eff. Mar. 1, 2001)); (b) the medical physician's testimony concerning "the victim's psychological injuries was irrelevant"; (c) the medical physician's testimony "contained inadmissible hearsay concerning medications prescribed by a psychiatrist and neurologist"; and (d) the State failed to lay a proper foundation for the medical physician's testimony "concerning the medications prescribed to [the] victim."

### 1. Supreme Court Rule 412

Defendant initially argues that the trial court erred in allowing Dr. Martinez to testify, over defense counsel's objections, as an expert witness because the State failed to provide a statement of the medical physician's qualifications as an expert in violation of Supreme Court Rule 412. Defendant further argues the State failed to provide medical reports authored by Dr. Martinez

No. 1-09-0517

also in violation of Supreme Court Rule 412.

Our standard of review for evaluating a discovery violation is whether the trial court abused its discretion. *People v. Hendricks*, 325 Ill. App. 3d 1097, 1102 (2001). Although the judgment of the trial court is given great weight, a reviewing court will find an abuse of discretion when a defendant is prejudiced by the discovery violation and the trial court fails to eliminate the prejudice. *People v. Weaver*, 92 Ill. 2d 545, 559 (1982). "[T]he purpose of the discovery rules is to protect the accused against surprise, unfairness, and inadequate preparation." *People v. Heard*, 187 Ill. 2d 36, 63 (1999). Although compliance with the rules is mandatory, failure to comply with the discovery rules does not require reversal absent a showing of prejudice. *Heard*, 187 Ill. 2d at 63 (citing *People v. Robinson*, 157 Ill. 2d 68, 78 (1993)). The burden of showing surprise or prejudice is upon the defendant, and the failure to request a continuance is a relevant factor in determining whether the testimony actually surprised or unduly prejudiced the defendant. *Robinson*, 157 Ill. 2d at 78.

Supreme Court Rule 412 governs disclosure to the accused in criminal cases and provides in pertinent part as follows:

> "(a) Except as is otherwise provided in these rules as to matters not
> subject to disclosure and protective orders, the State shall, upon written
> motion of defense counsel, disclose to defense counsel the following
> material and information within its possession or control:
>
> ***
>
> (ii) any written or recorded statements and the substance of

41

any oral statements made by the accused *** and a list of witnesses to the making and acknowledgment of such statements.

*** 

(iv) any reports or statements of experts, made in connection with the particular case, including *** a statement of qualifications of the expert." Ill. S. Ct. R. 421(a) (eff. Mar. 1, 2001).

In arguing that Dr. Martinez's provided expert testimony, defendant cites Dr. Martinez testimony that she was not the emergency room physician at the time, but was Catalla's "family physician" and "thus under the control of Catalla." Furthermore, Dr. Martinez testified concerning "other doctors' diagnoses" of Catalla and compiled information to ensure that Catalla could stay on leave from her employment. The State argues that the trial court properly allowed Dr. Martinez to testify as a "treating physician," which is distinguishable from an expert witness.

In *Tzystuck v. Chicago Transit Authority*, 124 Ill. 2d 226, 234-35 (1988), our supreme court distinguished between the two as follows:

"Treating physicians *** typically are not 'retained to render an opinion at trial' [under the language of the rule] but are consulted, whether or not litigation is pending or contemplated, to treat a patient's physical or mental problem. While treating physicians may give opinions at trial, those opinions are developed in the course of treating the patient and are completely apart from any litigation. Such an opinion is not formed in anticipation of a trial, but is simply the product of a

42

physician's observations while treating the patient, which coincidentally may have value as evidence at a trial. In this respect, the opinions of treating physicians are similar to those of occurrence witnesses who testify, not because they were retained in the expectation they might develop and give a particular opinion on a disputed issue at trial, but because they witnessed or participated in the transactions or events that are part of the subject matter of the litigation."
*Tzystuck*, 124 Ill. 2d at 234-35.

Under *Tzystuck*, whether a doctor is a treating physician or an expert depends on the physician's relationship to the case, not on the substance of his testimony. *Cochran v. Great Atlantic & Pacific Tea Co.*, 203 Ill. App. 3d 935, 940 (1990). A treating physician is one consulted for treatment whereas an expert is one consulted to render an opinion at trial. *People v. Blair*, 395 Ill. App. 3d 465, 485 (2009) (citing *Cochran*, 203 Ill. App. 3d at 941); see also *Tzystuck*, 124 Ill. 2d at 234.

In determining whether Dr. Martinez testified as an expert or a treating physician, we find *People v. Cortez*, 361 Ill. App. 3d 456 (2005), instructive. In *Cortez*, the defendant was convicted of driving with a blood-alcohol concentration of 0.08 or greater in violation of the Illinois Vehicle Code. On appeal, the defendant argued that the trial court erred in allowing a physician, who was not disclosed as an expert witness pursuant to Rule 412, to testify as to the effect of the use of an alcohol swab and the administration of a saline solution on the results of the defendant's blood test. The Second District of the Illinois Appellate Court, citing *Tzystuck*, rejected the defendant's claim, holding that, although the physician's testimony technically constituted an "opinion," it was

not rendered in anticipation of litigation. *Cortez*, 361 Ill. App. 3d at 466. Rather, the appellate court stated that the opinion was " 'simply the product of [the] physician's observations while treating the [defendant].' " *Cortez*, 361 Ill. App. 3d at 466 (quoting Tzystuck, 124 Ill. 2d at 234-35). Also in rejecting the defendant's claim, the appellate court reasoned that, as a practical matter, if the court were to adopt his position, all treating physicians would be required to testify as experts. *Cortez*, 361 Ill. App. 3d at 466.

In the case at bar, we cannot say that Dr. Martinez was an expert witness as opposed to a treating physician for discovery purposes. Dr. Martinez's testimony was a product of her observations while treating her patient Catalla in the hospital, and was not retained to provide an opinion at trial.

Dr. Martinez testified that she was contacted by emergency room personnel to inform her that Catalla needed to be admitted. Dr. Martinez testified that she began treatment of Catalla the following day and continued to treat her until she was released from the hospital. She further testified that she examined Catalla every two weeks following her release through the trial date.

Dr. Martinez further testified that Catalla complained of headaches, blurred vision, pain in her left arm and left side of her chest, and weakness in her left arm. Dr. Martinez testified that she examined Catalla and used the diagnostic tools of a CAT Scan, MRI and MRA. She also testified that she diagnosed Catalla with a concussion and prescribed eye drops, pain medication for her headache, and "transcent [*sic*]" for lack of sleep.

Dr. Martinez testified that, while Catalla was in the hospital, she consulted with a neurologist and a psychiatrist concerning Catalla's remarks that she had difficulty remembering

the events of the incident and had difficulty sleeping. She testified that the neurologist and the psychiatrist had prescribed medication during the course of Catalla's hospital stay. She did not testify to the neurologist's and psychiatrist's diagnoses. Rather, she provided only her opinion that Catalla suffered from a concussion.

Moreover, we cannot say that defendant was prejudiced by Dr. Martinez's medical testimony or failure to produce her *curriculum vitae*. The State disclosed to defendant the names of Dr. Martinez and other treating physicians before trial in response to defendant's interrogatories. The State also informed defendant that it would call Dr. Martinez as a "medical doctor" to testify at trial. The defendant was in possession of Catalla's hospital records before trial and was allowed to depose Dr. Martinez before she was called as a witness. That deposition afforded the defense the opportunity to obtain Dr. Martinez's qualifications as a medical doctor, and all of her findings and opinions. See *Kim v. Evanston Hospital*, 240 Ill. App. 3d 881, 890 (1992) ("[A]n opposing party will not be surprised when a treating physician testifies, because the witness was initially associated with the issues in litigation for reasons other than the sole purpose of rendering an opinion at trial."); *People v. Smith*, 236 Ill. App. 3d 35, 42 (1992) (holding that because testifying doctor was a treating physician, his testimony should not have come as a surprise to the defendant).

Defendant also claims that he is entitled to a new trial because the State committed a discovery violation by failing to produce Dr. Martinez's medical reports sent to Lincoln Park Hospital concerning Catalla's inability to return to work. Defendant argues that even if Dr. Martinez is not considered an expert for discovery purposes, the State was still required to

produce the medical reports because Rule 412 applies to all witness, not just experts. Ill. S. Ct. R. 412(a)(i) (eff. Mar. 1, 2001) (requiring the State, upon written motion of defense counsel, to disclose the names of persons whom the State intends to call as witnesses, together with their relevant written or recorded statements). However, when a defendant challenges a trial court's ruling on a purported discovery violation, we first determine whether a discovery violation occurred. *People v. Hood*, 213 Ill. 2d 244, 256 (2004).

Here, we cannot find that a discovery violation occurred. The State argued at trial that it did not have the medical reports in its possession. See Ill. S. Ct. R. 412(a) (eff. Mar. 1, 2001) (requiring the State to disclose material and information within its "possession or control"). Also, there is no evidence that the State had those medical reports in its possession or control or that the hospital supplied them to the State. In addition, the State did not rely on the medical reports in their case-in-chief, rather, the medical reports were first discovered existing during defendant's cross-examination of Dr. Martinez.

Even if we found that a discovery violation had occurred, we cannot say that a new trial is warranted. While compliance with the discovery requirements is mandatory, the failure to comply with these requirements does not require a reversal absent a showing of surprise or undue prejudice. *People v. Robinson*, 157 Ill. 2d 68, 78 (1993). As noted, the burden of showing prejudice is upon the defendant, and the failure to request a continuance is a relevant factor in determining whether the testimony at issue actually surprised or unduly prejudiced the defendant. *Robinson*, 157 Ill. 2d at 78. "A defendant cannot request only the most drastic measures, such as either an immediate mistrial or the total exclusion of testimony by a witness, and then on appeal

46

argue that he is entitled to a new trial when these requests are not granted." *Robinson*, 157 Ill. 2d at 78-79; see also *People v. Foster*, 76 Ill. 2d 365, 384 (1979) ("[If an undisclosed] statement was so earthshaking as to require complete reorganization of the defendant's case, counsel should have asked for a continuance or recess for that purpose [when the reports were discovered as existing] ***. His failure to do so is persuasive evidence that the prejudice here alleged was in fact trivial.").

In the case at bar, defendant stated at the sidebar conference that he was surprised by Dr. Martinez's testimony that she provided medical reports to the hospital concerning Catalla's treatment following her discharge. However, defendant did not request a continuance or recess to obtain them to determine their importance. Instead, he moved immediately for a mistrial.

In addition, our review of the record shows that defendant was not prejudiced by Dr. Martinez's testimony concerning the existence of medical reports. The State disclosed to defendant the name of Dr. Martinez and the names of other treating physicians before trial in response to defendant's interrogatories. The State also informed defendant that it would call Dr. Martinez as a "medical doctor" to testify at trial. The defendant was in possession of Catalla's hospital records before trial and defendant's cross-examination shows that he was aware that Dr. Martinez continued to treat Catalla following her discharge from the hospital. We cannot find any prejudice as a result of any failure to produce medical reports in the record of this case.

### 2. Irrelevant Testimony

We next consider defendant's claim that Dr. Martinez's testimony concerning Catalla's

"psychological harm, the medications prescribed by other [physicians], and the purpose of such medication" was irrelevant and "intended to evoke the sympathies of the jury."

In order to properly preserve any alleged error for appellate review, "a defendant must both specifically object at trial and raise the issue again in a posttrial motion." *People v. Woods*, 214 Ill. 2d 455, 470 (2005); *People v. Enoch*, 122 Ill. 2d 176, 186 (1988).

Defendant does not argue that he preserved this error. Our review of Dr. Martinez's testimony at trial shows that defendant did not object concerning psychological harm to Catalla, the medications prescribed to Catalla, or the purpose of such medications. Defendant also did not raise the issue in his posttrial motion but now raises this claim for the first time on appeal. Thus, defendant failed to preserve this error for review and has forfeited those issues before us.

Defendant also fails to request us to review this claim for plain error. The plain-error doctrine allows a reviewing court to reach an unpreserved error when either: (1) the evidence in the case is closely balanced, regardless of the seriousness of the error, or (2) the error is so serious that the defendant was denied a substantial right, regardless of the closeness of the evidence. *People v. Herron*, 215 Ill. 2d 167, 178-79 (2005). When a defendant fails to request this court to review a claim under plain error, he again forfeits the issue. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010) ("A defendant who fails to argue for plain-error review obviously cannot meet his burden of persuasion."); *People v. Nieves*, 192 Ill. 2d 487, 502-03 (2000).


### 3. Hearsay Statements

We next consider defendant's claim that Dr. Martinez testified concerning medications

namely, "Namenda, Effexor, and 'transcent' [*sic*] or Tranxene" prescribed by "other doctors" constitutes inadmissible hearsay.

As previously noted, in order to properly preserve any alleged error for appellate review, "a defendant must both specifically object at trial *and* raise the issue again in a posttrial motion." (Emphasis added). *Woods*, 214 Ill. 2d at 470; *Enoch*, 122 Ill. 2d at 186.

Defendant argues that he preserved this claim for review and points to a sidebar conference when defense counsel raised her concern that Dr. Martinez would testify concerning "posttraumatic stress when she has no qualifications to talk about it." Defendant further points to his posttrial motion which stated that "[t]he court erred in allowing hearsay testimony into the trial."

However, our review of Dr. Martinez's testimony at trial shows that defendant did not object when Dr. Martinez testified that a neurologist prescribed Namenda to Catalla. Defendant also did not object when Dr. Martinez testified that a psychiatrist prescribed Catalla Effexor. Defendant further did not object when Dr. Martinez testified that "[Catalla] was given transcent [*sic*] (phonetic)." Thus, defendant failed to preserve this error.

Defendant also fails to ask us to review this claim for plain error. The plain-error doctrine allows a reviewing court to reach an unpreserved error when either: (1) the evidence in the case is closely balanced, regardless of the seriousness of the error, or (2) the error is so serious that the defendant was denied a substantial right, regardless of the closeness of the evidence. *Herron*, 215 Ill. 2d at 178-79. As noted, when a defendant fails to request this court to review a claim under plain error, he forfeits the issue. *Hillier*, 237 Ill. 2d at 545 ("A defendant who fails to argue for

plain-error review obviously cannot meet his burden of persuasion."); *Nieves*, 192 Ill. 2d at 502-03 (2000).

Hearsay is a statement that is offered to prove the truth of the matter asserted, made by the declarant at a time when he or she was not testifying at trial. *People v. Dunmore*, 389 Ill. App. 3d 1095, 1106 (2009). However, a treating medical physician can testify to that which is in medical records concerning the patient's medical history, which is admissible as an exception to the hearsay rule. *Herron v. Anderson*, 254 Ill. App. 3d 365, 377 (1993). In addition, the medication that a patient is taking is "reliable and admissible as an exception to the hearsay rule." *Herron*, 254 Ill. App. 3d at 377. Thus, even if defendant did not forfeit this issue, Dr. Martinez's testimony was properly allowed.

### 4. Foundation

Last, we consider defendant's claim that the trial court erred in allowing Dr. Martinez to testify concerning the medications Namenda, Effexor, and "transcent [*sic*]" prescribed to Catalla by "other doctors," or the reasons such medications were prescribed because the State did not lay a proper foundation that Dr. Martinez was "qualified to testify about such matters." Evidentiary rulings are within the trial court's sound discretion and will not be reversed absent a clear abuse of discretion. *People v. Wheeler*, 226 Ill. 2d 92, 132 (2007).

First, we find defendant's claim that Dr. Martinez provided reasons the medications were prescribed to Catalla misstates the facts. As previously noted, Dr. Martinez did not testify to the neurologist's and psychiatrist's diagnoses or provide reasons why Catalla was prescribed those medications.

Next, in order to properly preserve the alleged error that the State failed to lay a proper foundation for Dr. Martinez testimony concerning the medications for appellate review, "defendant must both specifically object at trial and raise the issue again in a posttrial motion." *Woods*, 214 Ill. 2d at 470; *Enoch*, 122 Ill. 2d at 186.

Our review of Dr. Martinez's testimony at trial shows that defendant did not object when Dr. Martinez testified that "Nameda is for kind of increase of the memory, this and that, because she could hardly remember." Defendant also did not object when Dr. Martinez testified that Catalla was prescribe another medication, "transcent [*sic*] (phonetic), something to relax, like a chloraseptic, you know, like a Valium, something like that." Defendant failed to preserve the errors concerning Nameda and "transcent [*sic*]" and thus, the errors are forfeited.

The trial transcript also shows that defendant did not object when Dr. Martinez testified that "[the psychiatrist] started her on Effexor" which Dr. Martinez then explained, "is like a little like a stimulant." Thus, that error is also forfeited.

However, the trial transcript does show that defendant objected when the State specifically asked Dr. Martinez, "What does [Effexor] actually do?" The trial court allowed Dr. Martinez to testify over defendant's objection, "if she knows." Even if defendant preserved this error, we cannot say that the State failed to lay a proper foundation for this testimony.

As previously noted, Dr. Martinez testified at trial that she was Catalla's treating medical physician while Catalla was in the hospital following the physical altercation with defendant. She was not testifying as an expert witness. As part of her treatment, Dr. Martinez referred Catalla to a psychiatrist, who prescribed Effexor following that consultation. Effexor was thus part of

Catalla's medical history and Dr. Martinez would have personal knowledge of the effects of known medication. See *Atkins v. Thapedi*, 166 Ill. App. 3d 471, 475 (1988) (citing *Waterford v. Halloway*, 142 Ill. App. 3d 668 (1986)) (testimony of a treating physician may be offered only in regard to factual matters of which the doctor has personal knowledge). In addition, the trial court allowed Dr. Martinez to testify concerning the effects of Effexor if she knew. Accordingly, we cannot say that the trial court abused its discretion in allowing Dr. Martinez to testify concerning the effects of Effexor.

CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.