2021 IL App (1st) 180021-U

SIXTH DIVISION
March 19, 2021

No. 1-18-0021

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 11740 |
| | ) | |
| ROBERTA OYELEKE, | ) | Honorable |
| | ) | Carl B. Boyd, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Connors and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Defendant's conviction for aggravated battery is reversed where no reasonable trier of fact could have found that she did not act in defense of another person.

¶ 2    Defendant Roberta Oyeleke was found guilty of aggravated battery (720 ILCS 5/12-3.05(a),(f) (West 2012)) and sentenced to two years of probation after she stabbed Corey Gowdy four times. Ms. Oyeleke appeals her conviction arguing (1) State's evidence was insufficient to sustain her conviction because the State did not disprove that she acted in defense of another person; and, in the alternative, (2) the trial court's comments in finding her guilty show that the court erroneously recalled trial evidence, or otherwise misapplied the law and thereby denied her

right to due process. Key to both arguments is the fact that all eyewitnesses to the incident, including Mr. Gowdy himself, testified that at one point during this encounter, Mr. Gowdy was stomping on Ms. Oyeleke's boyfriend, codefendant Ricky Patterson, as he lay on the ground unable to get up. It was at this point, and after she had failed in her effort to pull Mr. Patterson away, that Ms. Oyeleke stabbed Mr. Gowdy with kitchen knife to force him to let go of Mr. Patterson because, as she said, she thought Mr. Gowdy was "ready to kill" Mr. Patterson. For the following reasons we find that no reasonable trier of fact could have found that the State disproved, beyond a reasonable doubt, her defense that she acted in defense of another person. We reverse her conviction.

¶ 3                                    I. BACKGROUND

¶ 4     Ms. Oyeleke and Mr. Patterson were charged by indictment with two counts of armed robbery and five counts of aggravated battery for acts committed against Mr. Gowdy on June 4, 2014. One count of aggravated battery alleged that they struck Mr. Gowdy with a hammer, and the remaining aggravated battery counts alleged that they stabbed Mr. Gowdy with a knife. The armed robbery counts alleged that the defendants had taken Mr. Gowdy's cell phone. Ms. Oyeleke and Mr. Patterson were tried together. The trial, which lasted four days, occurred over the span of four weeks. Mr. Patterson was acquitted of all charges, and a directed verdict was entered in favor of both defendants on the armed robbery charges.

¶ 5     During the bench trial, Mr. Gowdy testified that he and Ms. Oyeleke had been friends for about eight years. On the evening of June 3, 2014, after they had both finished work at their respective jobs, he picked her up around 5 or 6 p.m. and drove her to a store where they purchased liquor and cigarettes. Around 11 p.m., after spending some time socializing and drinking the liquor

in a park and at a barber shop, they went to a barbeque restaurant to pick up food. Mr. Gowdy ordered food for himself and Ms. Oyeleke, as well as a meal for her to bring home to Mr. Patterson, with whom she was living.

¶ 6    According to Mr. Gowdy, the dispute between them began when Ms. Oyeleke got angry and yelled at restaurant workers because the restaurant had failed to put her barbeque sauce on the side, as she had requested. Mr. Gowdy, who was friends with the restaurant's owners, was embarrassed, and he and Ms. Oyeleke argued as they left the restaurant.

¶ 7    Mr. Gowdy got in his car without Ms. Oyeleke and drove away. After Ms. Oyeleke called him three times, he came back and picked her up. They continued to argue in the car, and Mr. Gowdy testified that Ms. Oyeleke punched him in the eye while he was driving. He also testified that Ms. Oyeleke—with the car still in motion—opened the car door, dangled her feet out, "snatched the key" out of the car's ignition, and jumped out. Mr. Gowdy then pulled the car over, while Ms. Oyeleke approached "a random car" in a nearby parking lot and told its occupants that Mr. Gowdy hit her. Sometime after that, Mr. Patterson came to the parking lot, picked up Ms. Oyeleke, and they drove off. Mr. Gowdy then saw that his car key was broken, although part of it remained in the ignition and he was able to start his car and drive home. He testified that as he drove off, he noticed that the cigarettes and food he purchased were not in his car.

¶ 8    Later that night, Mr. Gowdy walked to Mr. Patterson and Ms. Oyeleke's apartment. At this point it was after midnight. Mr. Gowdy started banging on their door. He testified that he saw his cigarettes and liquor in their apartment and demanded their return. He testified that Mr. Patterson opened the door and stood in the doorway. Mr. Gowdy stood on a doormat but did not try to enter. According to Mr. Gowdy, he could hear Ms. Oyeleke on the phone talking to her mother and that

she told him that she was calling the police. Ms. Oyeleke came up behind Mr. Patterson, lit a cigarette and blew smoke in Mr. Gowdy's face. Mr. Gowdy testified that Mr. Patterson then came out of the doorway and "started beating [him] with a hammer," striking his left arm.

¶ 9 Mr. Gowdy and Mr. Patterson then took their physical fight to the parking lot of Ms. Oyeleke's building. Mr. Gowdy testified that he punched and kicked Mr. Patterson. At one point, according to Mr. Gowdy, Mr. Patterson was "laying on the ground trying to kick [him] in [his] private area." Mr. Gowdy grabbed Mr. Patterson's foot, and Mr. Patterson "reached out to [Ms. Oyeleke] for her help and she grabbed his arm." Mr. Gowdy then dragged Mr. Patterson across the parking lot, and Mr. Patterson's shoe came off.

¶ 10 As Mr. Gowdy and Mr. Patterson continued to fight, Mr. Gowdy felt Ms. Oyeleke "brush up against" him, and then felt "sharpness." After police arrived, Mr. Gowdy realized he had been stabbed. He had a total of four stab wounds to his bicep, back, and left shoulder. No medical expert or medical professional who treated Mr. Gowdy testified at trial as to his injuries. Mr. Gowdy himself testified that each of his four wounds required stiches and that, as a result of the stabbing, he had "tremors in [his] arms" and a "pulling feeling" in his left shoulder.

¶ 11 Mr. Gowdy testified that he had a cell phone in his hand when he knocked on the door, but realized it was missing after the fight. Mr. Gowdy later retrieved the phone at the police station.

¶ 12 On cross-examination, Mr. Gowdy admitted that he was "banging on the door" of Ms. Oyeleke's residence, and that he yelled and cursed when he demanded his food and cigarettes. He admitted he did not leave when asked to do so, but he denied that he lunged at Ms. Oyeleke or knocked her phone out of her hand. During cross-examination, he described the fight with Mr. Patterson as follows:

"Q. And by fight we mean a physical fight, right?

A. Yes.

Q. He was punching you?

A. No, he was hitting me with a hammer. That's what he was doing.

Q. Okay. At some point the hammer got out of his hand, right?

A. Yeah, it did.

Q. Okay.

A. And he ended up laying on top of it.

Q. And you were – he was punching you and trying to hit you, right?

A. Trying.

Q. Okay, and you were hitting back, right?

A. Oh, yeah.

Q. St[o]mping, correct?

A. Yeah.

Q. Doing – just – you had him on the ground, right?

A. Yes.

Q. And you were punching, right?

A. Indeed.

Q. Pardon?

A. Yes.

Q. Kicking and stomping him, right?

A. Yes.

Q. Grabbing his foot, right?

A. Yes.

Q. Dragging him around on the concrete, right?

A. Yes."

¶ 13    Blue Island police officer Nicholas Babbitt testified that he responded to a call of a disturbance and observed Mr. Gowdy in the parking lot with lacerations on his arm and back. Officer Babbitt did not see any damage to the door or signs of forced entry into Ms. Oyeleke's apartment.

¶ 14    Sergeant Christopher Connors testified that Ms. Oyeleke initially denied knowing the location of Mr. Gowdy's phone. Police subsequently searched her apartment and located the phone in a drawer of a dresser. Ms. Oyeleke then admitted to the police that she picked up the phone after the fight but claimed that she planned to return it to Mr. Gowdy.

¶ 15    After the State rested, the court granted the defendants' motion for a directed verdict with respect to the armed robbery counts, based on the hiding of the cell phone, but otherwise denied the motion.

¶ 16    Ms. Oyeleke's testimony regarding the events leading up to the fight in Mr. Gowdy's car was largely the same as Mr. Gowdy's. She confirmed that they had been close friends for about eight years—even spending holidays together—and that on June 3, 2014, they hung out together after work in a park, at a barber salon, and eventually at the barbeque restaurant. She also acknowledged that Mr. Gowdy drove off without her after she complained about the food she ordered. Her testimony diverges from Mr. Gowdy's once he picks her back up in his car.

¶ 17    Ms. Oyeleke testified that, after she got in his car, Mr. Gowdy struck her in the face and

that he was "grabbing and pulling" on her. She identified a photograph showing scratches on her left arm and said they were from Mr. Gowdy. She exited Mr. Gowdy's car near a parking lot and called Mr. Patterson, who then drove her back to their apartment. She testified that she threw the food from the restaurant into the street when she jumped out of Mr. Gowdy's car, but she denied that she took the key out of Mr. Gowdy's ignition.

¶ 18    Later that night, Ms. Oyeleke was on the phone with her mother when Mr. Gowdy arrived at her apartment. Mr. Gowdy was yelling and beating on the door, demanding his food, and threatening to kill her. Ms. Oyeleke testified that she "was scared for [her] life." She called the police, while Mr. Patterson opened the door to talk to Mr. Gowdy. According to Ms. Oyeleke, Mr. Gowdy reached around Mr. Patterson, knocked the phone out of her hands, and grabbed her around the neck. Mr. Gowdy and Mr. Patterson began fighting. Ms. Oyeleke recalled that the fight "spilled into the house and outside of the house" and that Mr. Gowdy was "beating [Mr. Patterson] so bad." She testified that "[h]e was dragging him, stomping him, hitting him, just doing everything. He was dragging him all on the floor."

¶ 19    When asked about her state of mind during this incident, Ms. Oyeleke responded that she was thinking at the time, "[Mr. Patterson] needs my help. I['ve] got to help him" because Mr. Gowdy was "stomping him, hitting him all in the face, dragging him, all types of stuff." She testified that the reason that she had grabbed a knife from the kitchen, ran outside and cut Mr. Gowdy's arm was that she was "tr[ying] to protect" Mr. Patterson because she believed Mr. Gowdy was "ready to kill" him. She testified that Mr. Gowdy did not let go of Mr. Patterson even after she had stabbed him. She acknowledged that she stabbed Mr. Gowdy more than once but she could not recall how many times or where she had stabbed him.

¶ 20    On cross-examination, Ms. Oyeleke stated that Mr. Gowdy was stomping Mr. Patterson "everywhere," including his head. She testified that there were "at least 12 or more stomps," that Mr. Gowdy landed "between one and three punches to the head" and "numerous" punches to Mr. Patterson's face.

¶ 21    Mr. Patterson confirmed much of Ms. Oyeleke's testimony. He knew that Ms. Oyeleke was going out with Mr. Gowdy on June 3, 2014, and testified that she called him a little after 11 p.m., and he then drove to go pick her up near a parking lot. Mr. Patterson noticed that Ms. Oyeleke had scratches on her arm and that her eye was red. Mr. Patterson drove Ms. Oyeleke back to their apartment. At around midnight, Mr. Gowdy arrived at the residence and "started screaming, cussing and banging on the door." Mr. Gowdy said that he was going to kill Ms. Oyeleke and that he "wanted his barbeque." Mr. Patterson opened the door, and Mr. Gowdy kept "yelling and screaming." Mr. Patterson told Mr. Gowdy to leave. Ms. Oyeleke called the police. When Mr. Patterson told Mr. Gowdy that police were on the way, he "reached up and grabbed [Ms. Oyeleke] around the neck." Mr. Patterson then grabbed a hammer and hit Mr. Gowdy in the torso.

¶ 22    After Mr. Patterson struck Mr. Gowdy with the hammer, the fight "spilled out to the parking lot area." Mr. Patterson testified that Mr. Gowdy "tried to swing at [him] and [he] swung [the hammer] and it slipped out [of his] hand, and it was [Mr. Gowdy's] fight after that." Mr. Patterson explained that he was "trying to the best of [his] ability" to hit Mr. Gowdy, but Mr. Patterson found himself on the ground. Mr. Patterson recalled: "[Mr. Gowdy] was stomping and punching [him], and [he] was trying to block [Mr. Gowdy's] stomps and his punches." When he would try to get up, Mr. Gowdy "would grab [his] leg and drag [him] and kick and punch [him] some more." Mr. Gowdy "let up" after police arrived.

¶ 23   Mr. Patterson identified a photograph of himself after the fight. He testified that it showed his "arm was scraped from [Mr. Gowdy] pulling me across the concrete." When asked if that was his only injury, Mr. Patterson answered that he also had bruises on his back that were not visible in the photograph and that his "upper body was sore."

¶ 24   Following closing argument, the trial court found both defendants not guilty of aggravated battery based on Mr. Patterson's use of the hammer. Despite Mr. Gowdy's testimony otherwise, the court accepted Mr. Patterson and Ms. Oyeleke's testimony that Mr. Patterson used the hammer after Mr. Gowdy had grabbed Ms. Oyeleke by the throat and ruled that the "affirmative defense of self-defense is sustained" on that count.

¶ 25   The court however, found Ms. Oyeleke guilty of the four aggravated battery counts based on her use of the knife. The court explained its ruling as follows:

"At some point Mr. Patterson and now Mr. Gowdy are in a man-to-man conflict, and they are fighting, and the fight finds its way out *** to the parking lot. And, unfortunately, Mr. Patterson is the victim of the punishment.

The testimony is that Mr. Gowdy is beating and punching *** Mr. Patterson and grabbing him throughout the parking lot. But *** both of these gentlemen are in hand-to-hand combat, and neither party has any instruments. It was equal disparity of force. No one is armed with any instruments during this fight. Unfortunately, one person is winning, and one person is losing, and from the testimony of all parties, Mr. Patterson definitely was losing the fight.

During the episode, [Ms. Oyeleke] appears to intervene in the fight, and she claims self-defense. And her self-defense claim is that Mr. Patterson's punishment during the fight

is so severe that she feels the need to slash and stab Mr. Gowdy to prevent any further harm or embarrassment to Mr. Patterson.

This Court believes that *** there was certainly a disparity of force, that the force that [Ms. Oyeleke] used was too great and too severe for a regular fistfight."

The court acquitted Mr. Patterson of these charges.

¶ 26    Ms. Oyeleke filed a posttrial motion to reconsider. At the hearing on that motion, defense counsel argued that the State had not met its burden to prove beyond a reasonable doubt that Ms. Oyeleke did not act in Mr. Patterson's defense. Counsel emphasized Mr. Gowdy's testimony acknowledging that he stomped, kicked, and punched Mr. Patterson. In denying the motion, the court remarked: "In this case, you had two men fighting. That's all you had. And I believe that outside of a normal fistfight, that's all we had." The court found that the force used by Ms. Oyeleke in stabbing Mr. Gowdy was "certainly in excess of what was necessary and needed *** applying reasonable standards." The court commented that Ms. Oyeleke could have done something else to intervene besides stabbing. The court also noted there was "no great bodily harm" to Mr. Patterson, who had "a few cuts and bruises at best." The court concluded that the "force [Ms. Oyeleke] applied was certainly in excess of what was necessary between these two men having basically a fistfight."

¶ 27    After a hearing, the court sentenced Ms. Oyeleke to two years of probation.

¶ 28                          II. JURISDICTION

¶ 29    Ms. Oyeleke's motion to reconsider her sentence was denied on December 7, 2017, and she timely filed her notice of appeal the following day, December 8, 2017. We have jurisdiction pursuant to article VI, section 6 of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6), and

Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. July 1, 2017), governing appeals from final judgments of conviction in criminal cases.

¶ 30                                    III. ANALYSIS

¶ 31    On appeal, Ms. Oyeleke argues that the State failed to prove beyond a reasonable doubt that her actions did not amount to defense of another. Because we agree, we do not reach her second claim on appeal, that the trial court denied her right to due process because it failed to properly recall certain evidence and misapplied the law.

¶ 32    In reviewing claims alleging insufficient evidence for a conviction, "this court considers whether, viewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original; internal quotation marks omitted.) *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007). The reviewing court "must allow all reasonable inferences from the record in favor of the prosecution." *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). "Only where the evidence is so improbable or unsatisfactory as to create reasonable doubt of the defendant's guilt will a conviction be set aside." *People v. Corral*, 2019 IL App (1st) 171501, ¶ 72.

¶ 33    Ms. Oyeleke was found guilty of aggravated battery under 720 ILCS 5/12-3.05(a)(1) and (f)(1) (West 2012), in that she committed a battery that resulted in "great bodily harm or permanent disability or disfigurement" and "[u]se[d] a deadly weapon other than by discharge of a firearm." A person commits battery if she "knowingly without legal justification by any means (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual." 720 ILCS 5/12-3(a) (West 2012).

¶ 34    Ms. Oyeleke raised the affirmative defense, defense of another, claiming that she was legally justified in stabbing Mr. Gowdy because she was acting in Mr. Patterson's defense. Once Ms. Oyeleke raised this defense, the State had the burden to prove beyond a reasonable doubt that she did not act in Mr. Patterson's defense, in addition to proving the other elements of aggravated battery. See *People v. Gray*, 2017 IL 120958, ¶ 50 ("[s]elf-defense is an affirmative defense, and once it is raised, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, in addition to proving the elements of the charged offense").

¶ 35    Under section 7-1 of the Criminal Code of 2012, "[a] person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force." If a person uses force intended or likely to cause death or great bodily harm, a person must "reasonably believe[] that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." 720 ILCS 5/7-1(a) (West 2012).

¶ 36    This affirmative defense involves six elements, several of which are interconnected:

"(1) unlawful force threatened against a person, (2) the person threatened was not the aggressor, (3) the danger of harm was imminent, (4) the use of force was necessary, (5) the person threatened actually and subjectively believed a danger existed that required the use of the force applied, and (6) the beliefs of the person threatened were objectively reasonable." *Gray*, 2017 IL 120958, ¶ 50.

If the State negates any one of these elements, the affirmative defense fails. *Id.*

¶ 37    "Whether a defendant acted in self-defense is *** a question for the [the trier of fact] to determine" (*Hayes*, 2011 IL App (1st) 100127, ¶ 31), and the standard of review on appeal is

"whether, after considering the evidence in the light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt that the defendant did not act in [defense of another]" (*Gray*, 2017 IL 120958, ¶ 51).

¶ 38    Despite the State's argument in its brief that it negated every element of Ms. Oyeleke's affirmative defense, at oral argument, the State acknowledged that its argument centered on its claim that it had disproven that there was a threat of imminent harm and disproven that Ms. Oyeleke's belief that her actions were necessary was reasonable. After viewing the evidence in the light most favorable to it, we find that the State failed to disprove any of the elements of defense of another where there was consistent and universal testimony that the fight between Mr. Patterson and Mr. Gowdy was not a "regular fistfight" at the time of Ms. Oyeleke's intervention. Rather, there was one man laying on the ground being stomped on by another.

¶ 39    We will address each of the elements of Ms. Oyeleke's defense and why we find that no reasonable fact finder could conclude on this record that the State had disproved any of them.

¶ 40                    A. Unlawful Force Threatened Against a Person

¶ 41    Ms. Oyeleke argues that this element is demonstrated by the undisputed evidence that Mr. Gowdy "was stomping [Mr.] Patterson." The State seemingly responds that this action by Mr. Gowdy was lawful, stating "[b]oth [Mr. Gowdy] and [Mr.] Patterson were engaged in the fight, where they were unarmed, and both kicked and punched one another. [citation] Therefore, the [State] negated the first element."

¶ 42    Kicking and punching another human being is unlawful battery. 720 ILCS 5/12-3(a) (West 2012) ("[a] person commits battery if he or she knowingly without legal justification by any means (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking

nature with an individual"). The State labeling this action as "mutual" does not in any way negate this element where, as discussed below, Mr. Gowdy initiated the fight by choking Ms. Oyeleke.

¶ 43    The State is correct that this court has held that self defense is not available in situations of mutual combat. *People v. White*, 293 Ill. App. 3d 335, 338 (1997). However, mutual combat is a limited doctrine describing "a fight or struggle which both parties enter willingly or where two persons, upon a sudden quarrel and in hot blood, mutually fight upon equal terms and where death results from the combat." *People v. Austin*, 133 Ill. 2d 118, 125 (1989). There is nothing about this factual scenario, where Mr. Gowdy came to the apartment, banged on the door, and choked Ms. Oyeleke—which then prompted Mr. Patterson's involvement—that would come within the doctrine of mutual combat.

¶ 44                    B. Person Threatened Was Not the Aggressor

¶ 45    The trial court determined that Mr. Gowdy arrived at Ms. Oyeleke and Mr. Patterson's apartment, "bang[ed] and kick[ed] on the outside exterior door of the apartment," "grabbed Ms. Oyeleke around the throat, and as a result of that, Mr. Patterson *** hit Mr. Gowdy with a hammer." The court determined that this use of force was justified where choking "can be fatal." Thus, the trier of fact has already found that Mr. Gowdy was the initial aggressor. The court clearly resolved any conflicting evidence on whether Mr. Gowdy or Mr. Patterson acted first by finding that Mr. Patterson's use of the hammer was in defense of another person.

¶ 46                    C. Danger of Harm Was Imminent and the Use of Force Was Necessary

¶ 47    All three witnesses testified that, at the moment that Ms. Oyeleke stabbed Mr. Gowdy, Mr. Gowdy had Mr. Patterson on the ground and was stomping on him. Mr. Gowdy admitted that he continued to stomp on Mr. Patterson, even after being stabbed, and Ms. Oyeleke testified that after

she stabbed Mr. Gowdy, he still would not let go of Mr. Patterson.

¶ 48    The State argues that "the fact that [Mr. Gowdy] had the upper hand at one point does not mean that the danger of harm was imminent" and also notes, as it does throughout its argument, that Mr. Patterson did not sustain serious injuries. Whether serious injuries were ultimately sustained, however, is not a relevant marker of whether an individual faced a threat of imminent harm. See *People v. Robinson*, 375 Ill. App. 3d 320, 336 (2007) (imminent harm means it is "reasonably probable" that harm will occur); *People v. Wood*, 81 Ill. 2d 537, 543 (1980) (finding that blood does not need to be drawn for the right of self defense to arise).The fact that Mr. Patterson escaped without a serious injury does not negate the fact that Mr. Gowdy, who was stomping, kicking, and hitting a man on the ground, *could have* seriously injured Mr. Patterson and that the danger of such injury was imminent.

¶ 49    Further, the use of force was necessary where Ms. Oyeleke tried other means of stopping Mr. Gowdy from stomping on Mr. Patterson. Before she grabbed a knife and stabbed Mr. Gowdy, Ms. Oyeleke called the police, announced to Mr. Gowdy that she had done that, and also unsuccessfully attempted to drag Mr. Patterson away from Mr. Gowdy. None of this was successful in stopping Mr. Gowdy's actions. The State failed to disprove that the danger was imminent or that the force used was necessary.

¶ 50          D. Subjective Belief that a Threat Existed Requiring the Use of Force Applied

¶ 51    Ms. Oyeleke testified that Mr. Gowdy was "beating [Mr. Patterson] so bad" and that "[h]e was dragging him, stomping him, hitting him, just doing everything." Ms. Oyeleke testified, that "[w]hat was going through [her] mind [was], [she] felt like he need[ed] [her] help." She testified that she "tried to protect [Mr. Patterson] from [Mr. Gowdy]" by "cut[ting] him on the arm"

"[b]ecause he was ready to kill [Mr. Patterson]." She testified that after she cut his arm, he did not stop, so she continued "trying to help [Mr. Patterson]."

¶ 52    The State argues that Ms. Oyeleke's testimony of her subjective belief is "belied by the record." However, the State does not cite to any contradiction to this testimony. Instead of offering support, the State argues that "the central issue is the reasonableness of defendant's subjective belief that circumstances existed that necessitated her use of force against [Mr. Gowdy]." While we will address this argument next, the State's reliance on it here appears to us to be a concession that Ms. Oyeleke subjectively believed that a threat existed and that the force she used was necessary. In any event, there is no evidence to suggest that the State in any way negated Ms. Oyeleke's testimony as to her subjective belief that Mr. Patterson was in danger.

¶ 53                    E. Ms. Oyeleke's Belief Was Objectively Reasonable

¶ 54    Finally, we agree with Ms. Oyeleke that the State failed to disprove that her belief was objectively reasonable. The State is correct that the reasonableness of a defendant's belief that the force used was necessary is a question for the trier of fact, involving credibility determinations and weighing of the evidence. See *Lee*, 213 Ill. 2d at 225 (explaining that reasonableness of the defendant's belief that the circumstances warranted deadly force "involved credibility determinations made by the jury"). We also recognize that it is the role of the trial court, sitting as the trier of fact, to determine the credibility of witnesses, to weigh evidence and draw reasonable inferences therefrom, and to resolve any conflicts in the evidence. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). We do not substitute our judgment for that of the trial court in these matters. *Corral*, 2019 IL App (1st) 171501, ¶ 71. However, a finding of fact must be reversed if it is against the manifest weight of the evidence, meaning that "the opposite conclusion is clearly evident or

the finding is arbitrary, unreasonable, or not based on the evidence." *People v. Cardona*, 2012 IL App (2d) 100542, ¶ 36.

¶ 55 Here, a key piece of evidence was universally attested to but appears to have been ignored in the trial court's finding. Mr. Gowdy admitted to stomping on Mr. Patterson multiple times while he way laying on the ground. Mr. Patterson likewise testified that Mr. Gowdy was "stomping [on him] and punching [him]" and that Mr. Gowdy "had [him] by [his] leg, and was—whenever [he] would try to turn over to get up [Mr. Gowdy] would grab [his] leg and drag [him] and kick and punch [him] some more." Ms. Oyeleke testified that Mr. Gowdy was "beating [Mr. Patterson] so bad" and that "[h]e was dragging him, stomping him, hitting him, just doing everything."

¶ 56 The court, in making its ruling, describes the scene as "a man-to-man conflict," a "regular fistfight," and a scene of "hand-to-hand combat" with an "equal disparity of force," where "unfortunately, Mr. Patterson is the victim of the punishment." The court claims this was merely a fight where "one person is winning, and one person is losing, and from the testimony of all parties, Mr. Patterson definitely was losing the fight." The court makes no mention of the universally testified to "stomping." The repeated characterization of the altercation as a "fistfight" or a "hand-to-hand fight" on equal terms is simply contrary to the undisputed testimony about what was occurring.

¶ 57 We have repeatedly recognized in other contexts that stomping risks great bodily injury or death. See *People v. Doolan*, 2016 IL App (1st) 141780, ¶ 52 (defendant and accomplice intended to kill or cause great bodily harm to the victim, "or knew that their conduct would create the strong possibility of death or great bodily harm" when they "kicked [the victim] in the face or chest" and punched him in the head); *People v. Taylor*, 409 Ill. App. 3d 881, 906-07 (2001) (the defendant's

conviction, which required that he knowingly caused great bodily harm, was not closely balanced where he kicked and stomped on two people); *People v. Horne*, 110 Ill. App. 2d 167, 175 (1969) ("allegation that defendant beat the victim with his fists and kicked her with his feet is sufficient to satisfy the statutory requirement that there be a 'substantial step' toward the commission of the offense" of murder). The State distinguishes each of these cases by stating that Mr. Patterson, unlike the victims of the kicking and stomping in cases, was not seriously injured. The trial court similarly appeared to believe that Mr. Patterson's lack of severe injury was evidence that Ms. Oyeleke was not justified in her action. As noted above, focusing on the actual injuries sustained following the altercation misses the point. The defendants in *Doolan*, *Taylor*, and *Horne* created a strong probability of severe injury. *Doolan*, 2016 IL App (1st) 141780, ¶ 52; *Taylor*, 409 Ill. App. 3d at 906-07; *Horne*, 110 Ill. App. 2d at 175. And Mr. Gowdy's kicking and stomping did the same. It was objectively reasonable to think that a person who was laying on the ground and being stomped on faced great bodily harm.

¶ 58    This is particularly true where, as here, Ms. Oyeleke had already called the police for help, had announced this to Mr. Gowdy, and had attempted to drag Mr. Patterson away from Mr. Gowdy. She took each of these other steps before using force. Ms. Oyeleke was a woman attempting to intervene in a fight between two men. It is unclear what alternatives she was left with to help her boyfriend from being stomped on repeatedly by another man who would not let him go. In this context, her belief that the amount of force she used was necessary was objectively reasonable, and any finding that it was not was simply contrary to the manifest weight of the evidence.

¶ 59    Viewing the evidence in the light most favorable to the State, no trier of fact could rationally conclude that Ms. Oyeleke's actions were anything but defense of another. Accordingly,

we grant Ms. Oyeleke's request that we reverse her conviction outright.

¶ 60                                    IV. CONCLUSION

¶ 61     For the foregoing reasons, we reverse the judgment of the trial court.

¶ 62     Reversed.